IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

ALVIN C. THOMPSON,
      Plaintiff,

vs.                               Case No.:  3:11cv533/RV/EMT

SGT. R. QUINN, et al.,
      Defendants.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Alvin C. Thompson ("Thompson"), an inmate of the Florida Department of Corrections ("DOC") proceeding pro se and in forma pauperis, commenced this case on November 2, 2011, by filing a civil rights complaint pursuant to 42 U.S.C. § 1983 (doc. 1).  Thompson subsequently filed a Second Amended Complaint (doc. 64), which is the operative pleading.  On February 13, 2013, Defendants Sergeant R. Quinn, Lieutenant G.R. Byrd, and Warden R.P. Tifft filed a motion for summary judgment (doc. 73).  Thompson responded in opposition to the motion (doc. 85).  Upon review of the evidence in the summary judgment record, it is the opinion of the undersigned that Defendants' motion should be granted in part and denied in part.

I.      BACKGROUND AND PROCEDURAL HISTORY

This case involves a use of force at Santa Rosa Correctional Institution ("SRCI") on October 1, 2009.  Thompson is suing Sergeant Quinn and Lieutenant Byrd, claiming that on that date they used excessive force on him by spraying him with chemical agent with no justification for doing so, in violation of the Eighth Amendment to the United States Constitution (doc. 64 at 10–11, 14–15; doc. 64-1 at 13–15, 22–23).[1]  Thompson is suing Warden Tifft, claiming he ordered the unjustified

_____

[1] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

and unconstitutional use of force (doc. 64 at 10; doc. 64-1 at 14). Thompson also claims that Defendants Quinn and Byrd violated state criminal laws by writing a false disciplinary report (doc. 64 at 11). Thompson alleges he suffered a burning sensation on his body as a result of the application of chemical agent, as well as emotional distress (doc. 64-1 at 15). He seeks declaratory and injunctive relief, "presumed" damages for costs, punitive damages, attorney fees, and "any additional relief this court deems just, proper and equitable" (doc. 64 at 14–15).

Defendants, in their motion for summary judgment, argue they are entitled to summary judgment because the use of force was necessary to stop Thompson's disruptive behavior; therefore, Thompson cannot show a violation of his Eighth Amendment rights (doc. 73 at 13–17). Defendants contend the absence of a constitutional violation entitles them to qualified immunity (*id.* at 21–22). They also argue they are entitled to Eleventh Amendment immunity to the extent Thompson seeks relief from them in their official capacities as employees of the DOC (*id.* at 10). Defendants argue Thompson's claims for compensatory and punitive damages are subject to dismissal pursuant to 42 U.S.C. § 1997e(e), because the evidence fails to show he suffered a "non-de minimis" physical injury (*id.* at 22–23). Defendants contend Thompson's state law claims are subject to dismissal, because a private person has no standing to request criminal prosecution of another (*id.* at 23–24).

The parties submitted evidence in support of their respective positions, including video evidence (docs. 73–75, 78, 85). The undersigned issued an order on February 15, 2013, notifying the parties that the court would take the motion under advisement on the date Thompson filed a response to Defendants' motion for summary judgment, pursuant to Fed. R. Civ. P. 56 and Rule 56.1(B) of the Local Rules (doc. 76).

## II.    MATERIAL FACTS

As this case comes before the court on Defendants' motion for summary judgment, the court views the facts in the light most favorable to Thompson, the non-moving party, *see* Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993), drawing those facts from the pleadings, depositions, and other evidentiary materials on file. The court resolves all issues of material fact in Thompson's favor and approaches the facts from Thompson's perspective, because the issues concern not which facts the parties might be able to prove, but, rather, whether or not

certain given facts showed a violation of clearly established law. *See* Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012) (citation omitted). Thus, the operative facts at the summary judgment stage "may not be the 'actual' facts of the case." Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 926 n. 3 (11th Cir. 2000). Once the court has determined the relevant set of facts and drawn all inferences in favor of Thompson, to the extent supportable by the record, the reasonableness of Defendants' actions is a pure question of law. *See* Scott v. Harris, 550 U.S. 372, 381 n.8, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (emphasis omitted); *see also*, McQueen v. Johnson, No. 11-15069, 2013 WL 425979, at *1 n.1 (11th Cir. Feb. 5, 2013) (unpublished) (noting the district court erred insofar as it concluded that "a jury reasonably could find that the use of any force after the initial tasing was excessive" and thus that genuine issues of material *fact* prevented it from entering summary judgment as to the *reasonableness* of the defendants' use of force) (emphasis in original). The court conveys only those facts that are material.

With regard to the factual positions asserted by the parties, the court applies the standard set forth in Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> **(1) Supporting Factual Positions.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> . . . .
>
> **(4) Affidavits or Declarations.** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c) (2010). If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court will consider the fact undisputed for purposes of the motion for summary judgment, or grant summary judgment

if Defendants' motion and supporting materials—including the facts considered undisputed—show that Defendants are entitled to it. *See* Fed. R. Civ. P. 56(e)(2, 3) (2010).

Additionally, the court notes that some relevant events were captured by a fixed-wing video camera and a handheld video camera, and both of those videotapes are part of the record (doc. 78, Exs. F, K). The facts presented here are viewed in the light depicted by the videotapes to the extent those facts are captured on camera. *See* Scott, 550 U.S. at 380–81 (stating that when a videotape of an incident is part of the record, the court should view the facts in the light depicted by the videotape). However, not all material facts were captured by the cameras. Indeed, the material matters in dispute, discussed *infra*, allegedly occurred prior to videotaping by the handheld camera, which is the only camera with audio. The fixed-wing video does not include audio.

Finally, any facts included in Defendants' statement of material facts that are not controverted in Thompson's response are deemed admitted. *See* N.D. Fla. Loc. R. 56.1(A) (all material facts set forth in moving party's statement of undisputed material facts will be deemed admitted unless controverted by statement required to be filed and served by opposing party). Applying these standards, the court conveys the following as the material facts.

On October 1, 2009, Defendant Quinn was the housing supervisor for the 3:00–11:00 p.m. shift in Thompson's dormitory (doc. 73, Defendants' Statement of Material and Genuine Facts ¶ 10; doc. 73-4, Declaration of Ronnie Quinn ¶ 5). He entered the quarter deck area of D-dormitory at approximately 3:00 p.m. and heard an inmate kicking on his cell door in wing 2 (*id.*).[2] Quinn states he entered wing 2 at approximately 3:20 p.m. and observed and heard Thompson kicking on his cell door and yelling obscenities onto the wing (Quinn Decl. ¶ 7). Quinn states he counseled with Thompson and ordered him to cease his disruptive behavior (*id.*). Thompson disputes these facts, and denies he was engaging in disruptive behavior (doc. 85 ¶¶ 28–30). As previously noted, the fixed-wing video does not include audio; therefore, it does not resolve the factual dispute as to whether Thompson was kicking his cell door and yelling obscenities. The fixed-wing video shows that Defendant Quinn entered wing 2 at 3:17 p.m. and, for approximately four (4) minutes, spoke

---

[2] The quarter deck area is a room where the officer's control station is located and provides access to the three wings within the dormitory (doc. 73-4, Quinn Decl. ¶ 5). The control station is an enclosed booth where an officer controls and secures all the doors in the dormitory (*id.*).

with Thompson at his cell door (doc. 78, Ex. F, fixed-wing video at 15:17:41:578–15:21:21:562).[3]
Thompson states during this 4-minute period, Quinn told him he did not know what was going on,
but Defendant Warden Tifft instructed him to spray Thompson with chemical agent (doc. 64 at 10;
doc. 85 ¶ 1; doc. 85-1 at 21, Affidavit of Tramell Allen; doc. 85-1 at 24, Affidavit of Jerome K.
Lockhart; doc. 85-1 at 16–17, 30–31, Affidavits of Alvin C. Thompson).[4]  Defendant Quinn then told
Thompson to "get ready," because he would be back (doc. 64 at 10; doc. 85 ¶ 1; doc. 85-1 at 30–31,
Thompson Aff.).[5]  When Quinn left the wing at approximately 3:21 p.m., Thompson was not
engaging in any disruptive behavior (doc. 73, Defendants' Statement of Material and Genuine Facts
¶ 13; doc. 73-4, Quinn Decl. ¶ 7).

At approximately 5:33 p.m., Defendant Byrd entered D-dormitory to conduct a routine
security check, and Quinn told him that Thompson was repeatedly kicking on his cell door and
yelling obscenities in the wing (doc. 73, Defendants' Statement of Material and Genuine Facts ¶ 15;
doc. 73-4, Quinn Decl. ¶ 9; doc. 73-8, Declaration of Gregory Byrd ¶¶ 6, 8).  The fixed-wing video
did not indicate any visible disruptions in wing 2 during this two-hour period, but, again, the fixed-
wing video has no audio (*see* doc. 78, Ex. F, fixed-wing video).  Defendant Quinn entered wing 2
at approximately 5:37 p.m. to assist with retrieval of food trays from the cells (doc. 78, Ex. F, fixed-
wing video at 17:37:20:562; doc. 73-4, Quinn Dec. ¶ 10).  Another officer entered wing 2 at
approximately 5:38 p.m. (doc. 78, Ex. F, fixed-wing video at 17:38:01:562).  Defendant Byrd
(depicted in the fixed-wing video wearing a white shirt) entered wing 2 at approximately 5:40 p.m.
(doc. 78, Ex. F, fixed-wing video at 17:40:39:562; doc. 73-8, Byrd Decl. ¶ 8).  Byrd states upon
entering the wing, he observed disruptive behavior coming from Thompson's cell (doc. 73-8, Byrd
Decl. ¶ 8).  Again, Thompson disputes this fact and states he was not engaging in disruptive behavior

---

[3] Defendants state that while the times on the fixed-wing cameras are synchronized within a dormitory, they are
not synchronized between dormitories and could vary from one dormitory to another (doc. 73-6, Declaration of Randy
Tifft ¶ 14).  Staff do not know the time depicted on the fixed-wing video (*id.*).  When a handheld camera is used, for
example to document uses of force, staff use the clock on the handheld camera to establish the time of events noted in
use of force reports (*id.*).

[4] Defendants dispute this fact (doc. 73-6, Declaration of Randy Tifft ¶4; doc. 73-4, Quinn Dec. ¶ 4).

[5] Defendants dispute this fact (doc. 73-4, Quinn Decl. ¶¶ 3–4).

(doc. 85 ¶¶ 28–30). Byrd approached Thompson's cell, while Defendant Quinn was still assisting with food tray retrieval in the wing (doc. 78, Ex. F, fixed-wing video at 17:40:43:562; doc. 73-4, Quinn Decl. ¶ 10; doc. 73-8, Byrd Decl. ¶ 8). Byrd states he ordered Thompson to cease his disruptive behavior, and Thompson eventually complied (doc. 73-8, Byrd Decl. ¶ 8). Thompson states when Byrd came to his cell door, he told him, "You know what time it is," and then instructed Thompson that if he removed his clothing and kicked on his cell door to make it appear for the handheld video camera that he was being disruptive, Thompson would be sprayed with chemical agent only once instead of three times, and he would not be deprived of his clothing, property, mattress and shoes (doc. 85-1 at 21, Allen Aff.; doc. 85-1 at 23, Lockhart Aff.; doc. 85-1 at 24, Declaration of Kenneth "Kinney" Bass; doc. 85-1 at 26–27, Affidavit of Shakeeb K. Chin; doc. 85-1 at 30–31, Thompson Aff.).[6] Byrd left Thompson's cell door at 5:42 p.m. (doc. 78, Ex. F, fixed-wing video at 17:42:14:562). According to the fixed-wing video, Quinn and Byrd were never at Thompson's cell door at the same time during this period.

The fixed-wing video shows that an officer walked through the wing at approximately 5:57 p.m. (doc. 78, Ex. F, fixed-wing video at 17:57:12:546). From 6:04 p.m. to 7:07, officers were in and out of the wing, escorting inmates to and from the showers, collecting mail, and conducting routine walks through the wing (doc. 78, Ex. F, fixed-wing video at 18:05:17:546–19:07:38:546; doc. 73-4, Quinn Decl. ¶ 24). At no time did any officer alert his attention to Thompson's cell (id.). During this time, Defendant Quinn informed Defendant Byrd that at approximately 6:40–6:50 p.m., Thompson was kicking on his cell door and yelling obscenities (doc. 73-4, Quinn Dec. ¶¶ 11, 24). Defendant Byrd states he entered the dormitory and observed Thompson behaving in a disruptive manner (doc. 73-8, Byrd Decl. ¶ 9). Again, Thompson disputes this fact and states he was not behaving disruptively (doc. 85 ¶¶ 28–30). Defendant Byrd contacted the Duty Warden, Major Chad Thompson, and the shift supervisor, Captain Barry Lee, and "advised them of the situation" (doc. 73-8, Byrd Dec. ¶ 12). Disruptive behavior cannot be allowed, because it can escalate from one inmate to multiple inmates housed in the dormitory (doc. 73, Defendants' Statement of Material and Genuine Facts ¶ 19; doc. 73-4, Quinn Decl. ¶ 22). Byrd verified that Thompson did not have any

---

[6] Defendants dispute this fact (doc. 73-8, Byrd Decl. ¶¶ 3–4).

medical condition that would be exacerbated by the use of chemical agents by checking his Chemical Agents Risk Assessment form with Nurse Mary Donahoo (doc. 73, Defendants' Statement of Material and Genuine Facts ¶ 20; doc. 73-). Duty Warden Thompson approved the use of chemical agent on Thompson (doc. 73, Defendants' Statement of Material and Genuine Facts ¶ 21). Captain Barry Lee entered the dormitory, and Officer David Johnston retrieved a handheld digital video recorder (doc. 73, Defendants' Statement of Material and Genuine Facts ¶¶ 21, 22; doc. 73-7, Declaration of Barry Lee ¶ 4).

At approximately 7:26 p.m. on the fixed-wing video (7:25 p.m. according to the time on the handheld video camera, which is the time used in Defendants' affidavits and use of force documentation), Captain Lee, Officer Johnston, Defendant Quinn, and Defendant Byrd entered wing 2 and walked toward Thompson's cell (doc. 78, Ex. F, fixed-wing video at 19:26:42:531; doc. 78, Ex. K, handheld video; doc. 73-4, Quinn Decl. ¶ 13; doc. 73-7, Lee Decl. ¶ 6; doc. 73-8, Byrd Decl. ¶ 14). Thompson had removed his clothing (doc. 64-1 at 10; doc. 85-1 at 16–17, 30–31 Thompson Affs.). Thompson kicked on his cell door (doc. 78, Ex. K, handheld video; doc. 73-4, Quinn Decl. ¶ 13–14; doc. 73-7, Lee Decl. ¶¶ 6–7; doc. 73-8, Byrd Decl. ¶ 14–15), but Thompson states he did so only after he saw Byrd at his cell door (doc. 64-1 at 11; doc. 85 at ¶¶ 4, 9; doc. 85-1 at 30–31, Thompson Aff.). Byrd ordered Thompson to cease his behavior, and instructed him that this was the final order and failure to follow the order would result in the use of chemical agents (doc. 78, Ex. K, handheld video; doc. 73-8, Byrd Decl. ¶ 14). Thompson continued to kick his cell door cell (doc. 78, Ex. K, handheld video; doc. 73-4, Quinn Decl. ¶ 13; doc. 73-8, Byrd Decl. ¶ 14). Byrd walked away from the cell front and, after a brief pause, Thompson began kicking on his door again (doc. 78, Ex. K, handheld video); but Thompson states he did so only after Byrd gave "winks of the eye and nods of the head" as he stood near the handheld video operator, to signal Thompson to engage in disruptive behavior (doc. 64-1 at 11; doc. 85 at 4; doc. 85-1 at 16–17, 30–31, Thompson Affs.).[7] At approximately 7:27, while Thompson was kicking on his door, Byrd exited wing 2 and retrieved a canister of Oleoresin Capsicum ("OC") (doc. 78, Ex. F, fixed-wing video at 19:27:30:546; doc. 73-8, Byrd Decl. ¶ 14). Byrd reentered wing 2 (doc. 78, Ex. F, fixed-wing video at 19:31:19:531; doc.

---

[7] Defendants dispute this fact (doc. 73-8, Byrd Decl. ¶¶ 3–4).

73-8, Byrd Decl. ¶ 14). While Thompson was still kicking his cell door, at approximately 7:31 p.m. (7:30 p.m. on the handheld video), Byrd ordered Defendant Quinn to administer three (3) one-second bursts of OC through the opened handcuffing portal of the cell door (doc. 78, Ex. F, fixed-wing video at 19:31:37:515; doc. 78, Ex. K, handheld video; doc. 73-4, Quinn Decl. ¶ 14; doc. 73-8, Byrd Decl. ¶ 14). Quinn sprayed Thompson with chemical agent (doc. 64-1 at 10; doc. 73-8, Byrd Dec. ¶ 15; doc. 78, Ex. K, handheld video). Thompson did not attempt to impede the OC either physically or by using his property to do so (doc. 73, Defendants' Statement of Material and Genuine Facts ¶ 25; doc. 73-4, Quinn Decl. ¶¶ 14, 19; doc. 85 ¶ 10). Quinn sprayed a total of 82 grams of OC (doc. 73-8, Byrd Decl. ¶ 15). Thompson kicked on his cell door for a few seconds and then ceased (doc. 78, Ex. K, handheld video; doc. 73-4, Quinn Decl. ¶ 16; doc. 73-8, Byrd Dec. ¶ 16). Inmate Lockhart states he heard Defendant Byrd tell Thompson he did a good job for the camera (doc. 85-1 at 24, Lockhart Aff.).

At approximately 7:34 p.m. (7:32 on the handheld video), Quinn handcuffed Thompson, and Thompson exited his cell and was escorted to a cool water shower, where he took a four-minute shower (doc. 73, Defendants' Statement of Material and Genuine Facts ¶ 27; doc. 78, Ex. F, fixed-wing video at 19:34:20:515; doc. 78, Ex. K, handheld video; doc. 73-4, Quinn Decl. ¶ 17). Thompson was issued clean boxer shorts (doc. 73-4, Quinn Decl. ¶ 17). He received a post use-of-force medical examination (doc. 73, Defendants' Statement of Material and Genuine Facts ¶ 27; doc. 73-4, Quinn Decl. ¶ 18; doc. 73-8, Byrd Decl. ¶ 17; doc. 73-5 at 14–15; doc. 73-10, Declaration of Steven L. Harris ¶ 4, 73-10 at 3–5). Thompson's vital signs were normal; he was alert, oriented, and responsive to questions; his lungs were clear; and he voiced no complaints (doc. 73-10, Declaration of Steven L. Harris ¶ 4, 73-10 at 3–5). Thompson had no identifiable injuries that required medical treatment, and he was instructed to utilize sick call if any problems developed (*id.*). Thompson states he suffered a burning sensation over his body as a result of being sprayed with chemical agent (doc. 73-2, Thompson Deposition 78:17–23, August 8, 2011). He states he additionally suffered emotional distress (doc. 85-1 at 30–31, Thompson Aff.). Thompson did not seek medical assistance or otherwise complain to medical staff of any problems related to the use of chemical agent (doc. 73-2, Thompson Deposition 78:24–25, August 8, 2011; doc. 73-10, Harris Decl. ¶ 5).

Thompson was not deprived of his clothing, mattress, or other property (doc. 73-4, Quinn Decl. 18; doc. 73-8, Byrd Decl. ¶ 17). According to DOC procedure, if an inmate uses his property to impede security, for example, by covering themselves with clothing to prevent the application of OC or using his mattress to shield himself, the inmate is placed on 72-hour property restriction (doc. 73, Defendants' Statement of Material and Genuine Facts ¶ 25; doc. 73-4, Quinn Decl. ¶ 19). As previously stated, Thompson did not use his property in an improper manner (*id.*).

The Assistant Warden of Operations, John Whitehurst, as the acting warden on behalf of administration at SRCI, reviewed the Use of Force documents and video for compliance with DOC rules and procedures, and on October 14, 2009, submitted the report to be forwarded to the Office of the Inspector General's use-of-force unit for final review and approval (doc. 73, Defendants' Statement of Material and Genuine Facts ¶ 30; doc. 73-6, Tifft Decl. ¶ 9). Thereafter, Inspector Dean Glisson of the use-of-force unit reviewed the use of force and approved it on December 10, 2009 (doc. 73, Defendants' Statement of Material and Genuine Facts ¶ 31; doc. 73-9, Declaration of Dean Glisson ¶¶ 3–10).

Defendant Quinn charged Thompson with a disciplinary infraction of participating in a disturbance, a violation of Rule 33-601.314(2–3) of the Florida Administrative Code, based upon allegations that Thompson kicked on his cell door and yelled obscenities into the wing at 3:20 p.m. and continued to do so despite Quinn's orders directing him to stop (doc. 73, Defendants' Statement of Material and Genuine Facts ¶ 33; doc. 64-1 at 16–17; doc. 73-3). As Quinn's supervisor, Defendant Byrd reviewed the disciplinary report and approved it (doc. 73-8, Byrd Decl. ¶ 18). Thompson was convicted of the disciplinary infraction and sentenced to thirty (30) days in disciplinary confinement (doc. 64-1 at 16; doc. 73-3; doc. 73-8, Byrd Decl. ¶ 18).

III.    LEGAL STANDARDS

A.    Summary Judgment Standard

In order to prevail on their motion for summary judgment, Defendants must show that Thompson has no evidence to support his case or present affirmative evidence that Thompson will be unable to prove his case at trial. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). If Defendants successfully negate an essential element of

Thompson's case, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*, 477 U.S. at 248. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* Thompson must show more than the existence of a "metaphysical doubt" regarding the material facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Speculation or conjecture from a party cannot create a genuine issue of material fact. *See* Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005). "A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." Young v. City of Palm Bay, Fla., 358 F.3d 859, 860 (11th Cir. 2004); *see also* Celotex Corp., 477 U.S. at 324. Thompson must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *See* Celotex Corp., *supra*; Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers or other materials on file designate specific facts showing that there is a genuine issue for trial); Hammer v. Slater, 20 F.3d 1137 (11th Cir. 1994).

Evidence presented by Thompson in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him. *See* Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); Jones v. Cannon, 174 F.3d 1271, 1282 (11th Cir. 1999). Nonetheless, Thompson still bears the burden of coming forward with sufficient evidence of every element that he must prove. *See* Celotex Corp., 477 U.S. at 317. A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp., 477 U.S. at 322.

B.     Excessive Force

Claims of excessive force by prison officials fall under the Eighth Amendment's proscription against cruel and unusual punishment. The standard applied to Eighth Amendment claims has a subjective and an objective component. As to the objective component, "not every malevolent touch by a prison guard gives rise to a federal cause of action." Wilkins v. Gaddy, 599 U.S. 34, 130 S. Ct. 1175, 1178, 175 L. Ed. 2d 995 (2010) (citing Hudson v. McMillian, 503 U.S. 1, 9, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, supra (some internal quotation marks omitted). An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim. Id. (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).

Under the subjective component, to sustain an Eighth Amendment challenge it must be shown that prison officials' actions amounted to an "unnecessary and wanton infliction of pain." Whitley v. Albers, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986). "Force is deemed legitimate in a custodial setting as long as it is applied 'in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm.'" Skrtich v. Thornton, 280 F.3d 1295, 1300 (11th Cir. 2002) (quoting Whitley, 475 U.S. at 320–21). In determining whether an application of force was applied maliciously and sadistically to cause harm, a variety of factors are considered including: "the need for the application of force; the relationship between that need and the amount of force used; the extent of the threat to the safety of staff and inmates, as reasonably perceived by officials; the extent of injury; and any efforts made to temper the severity of the response." Hudson, 503 U.S. at 7–8; see also Whitley, 475 U.S. at 321; Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999). From consideration of such factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." Whitley, 475 U.S. at 321 (quoting Johnson, 481 F.2d at 1033). Although the absence of serious injury is relevant to an excessive force claim, the core judicial inquiry is not

whether a quantum of injury was sustained but rather whether force was applied in a good-faith effort to maintain or restore discipline or whether it was applied maliciously and sadistically to cause harm. *See* Wilkins, 130 S. Ct. at 1178–79; *see also* Hudson, 503 U.S. at 4. Additionally, under Eleventh Circuit law, in cases in which a collective use of force is alleged, the court need not analyze separately the force administered by each officer to determine which of the blows or other acts, if any, constituted the use of excessive force. Skrtich, 280 F.3d. at 1302.

That officials followed prison regulations in administering force or restraint provides evidence that they acted in good faith and not to inflict pain. Campbell, 169 F.3d at 1376 (citation omitted). Thus, as summarized in Campbell, "[p]recedent dictates that [the determination whether defendants acted maliciously and sadistically for the very purpose of causing harm] be guided by the five Hudson/Whitley factors outlined above, by deference to prison officials' punitive judgments, and by this Court's previous holdings that compliance with prison policies evidences officials' good faith." *Id.*

The Court in Whitley narrowed the precise inquiry applicable when deciding whether officials are entitled to judgment as a matter of law:

> courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives. Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury.

Whitley, 475 U.S. at 322 (emphasis added).

C.    Qualified Immunity

The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). This doctrine is intended to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

In Saucier v. Katz, the Supreme Court mandated a two-step process for lower courts to follow in resolving qualified immunity claims. 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). First, the court had to decide whether the facts that the plaintiff alleged showed a violation of a constitutional right. Pearson, 555 U.S. at 232 (citing Saucier, 533 U.S. at 201). Second, if the plaintiff satisfied the first step, the court had to determine whether "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Id. (quoting Saucier, 533 U.S. at 201).

The Supreme Court revisited Saucier's mandatory two-step inquiry in Pearson, 555 U.S. at 233–36. The Court held that while the Saucier process is often appropriate, "it should no longer be regarded as mandatory"; rather, "[t]he judges of the district courts and the court of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id. at 236.

IV.    ANALYSIS

A.    Eighth Amendment Violation

As previously noted in the Material Facts section supra, the parties dispute three material facts. The first fact in dispute concerns: (1) whether Defendant Tifft ordered Defendant Quinn to spray Thompson with chemical agent for no apparent reason; and (2) whether Quinn told Thompson this, and then told Thompson to "get ready" because he would be back. Defendants Tifft and Quinn denied these allegations in their affidavits. Thompson produced evidence, in the form of his own affidavits and those of inmates who allegedly overheard Quinn's statements to Thompson, demonstrating a genuine issue of fact for trial. Defendants contend Thompson's evidence is inadmissible hearsay, and, therefore, cannot be used for purposes of summary judgment (doc. 73 at 11–13). Defendants argue this inadmissible evidence is the only evidence connecting Defendant Tifft to this lawsuit; therefore, he should be dismissed as a Defendant (id. at 13). Under the Federal Rules of Evidence, "[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." Fed. R. Evid. 805. The first statement at issue here, that is, Quinn's statement to Thompson that he (Quinn) did not know what was going on, but he had been instructed by Tifft to spray

Thompson, is not inadmissable "hearsay within hearsay." Each declarant, Defendant Quinn and Defendant Tifft, is a party to this action, and each Defendant's statement is being offered against him. Therefore, each statement conforms to the rule providing that a statement by an opposing party, offered against the opposing party and made by the party in an individual or representative capacity, is not hearsay. *See* Fed. R. Evid. 801(d)(2)(A). Likewise, Quinn's other statement to Thompson—to "get ready" because he would be back—is admissible as a statement offered against an opposing party. *Id.* Therefore, the undersigned concludes Thompson has shown a genuine issue as to these material facts.

Second, the parties dispute whether Defendant Byrd told Thompson that if he removed his clothing and kicked on his cell door to make it appear for the video camera that he was being disruptive, he would be sprayed with chemical agent only once instead of three times, and he would not be deprived of his clothing, property, mattress and shoes. Defendants contend the fixed-wing video demonstrates the falsity of Thompson's deposition testimony, as well as the statements of some of his witnesses, that Quinn and Byrd together "coached" Thompson (doc. 73 at 3, 16–17). During his deposition, Thompson stated the following:

Q. Who came to your cell the second time?

A. Lieutenant Byrd. Lieutenant—both of them came—when Lieutenant Byrd was lead, but he was like [right] behind Lieutenant Byrd, like right there.

Q. What time?

A. It was like [ ] six or seven o'clock, seven. I want to say seven. Six, seven o'clock.

Q. And both of them were at your door at the same time?

A. Right.

Q. Were they at the door with you with any of the other officers?

A. No.

Q. It was just these two?

A.  Just these two.

Q.  Sergeant Quinn?

A.  Quinn.

Q.  Lieutenant Byrd, were [sic] at your door?

A.  Correct.

Q.  Sometime between six and seven p.m. together?

A.  Right.

Q.  And that was your front door.  Is there any other windows or anything like that in your cell?

A.  Yeah.  There's a front—there's a back window and there's a window on the door.

Q.  Yeah, but they came to the front?

A.  To the cell door.

Q.  The cell door that could be in view of the camera?

A.  Right.

Q.  And both of them came together?

A.  Right.  Both of them came together.

Q.  And they both spoke to you together?

A.  No.  One—first Byrd—Byrd asked me what was going on and he say—he say, you know what time it is, do you know what time it is, you can make it hard or you can make it easy on yourself.  He say, you do good for the camera, I'll only hit you one time and it will be over with and I'll let you keep all your property, let you keep everything.

Q.  And this was Lieutenant Byrd?

A.  Lieutenant Byrd.

Q.  And then Quinn was with him, as well, at the time?

A.  Right.  Quinn—Quinn—I think Quinn walked off.  Lieutenant Byrd and then Quinn—

Q.  So, they both came to your cell?

A.  Right.  They both came—

Q.  Sergeant Quinn and Lieutenant Byrd both came to your cell?

A.  Right.

Q.  At this time?

A.  Right.

Q.  And then Sergeant Quinn walked away and Lieutenant Byrd spoke to you?

A.  And Lieutenant Byrd stood there, right.

Q.  And you're sure they both came to your cell together and then one walked away and the other one talked to you?

A.  I want to say sure but, you know, I'm not—I can't say factually but I'm almost certain that's what happened because I remember Quinn, Lieutenant Byrd, I seen the white shirt and then, yeah, they came down together.

Q.  So, they did come together?

A.  They came together.  And Byrd the one that talked to me and Quinn walked off.

(doc. 73-2, Thompson Deposition 49:21–52:17, August 8, 2011).

The fixed-wing video does not show Quinn and Byrd at Thompson's cell door at the same time during the time period when Thompson states Byrd coached him.[8]  However, regardless of

---

[8] Therefore, the affidavits of Inmate Bass, Inmate Chin, and Inmate Allen on this point are conclusively refuted.  Inmate Bass stated Thompson was "approached by Sgt. R. Quinn and Lt. G.R. Byrd, who instructed Thompson . . ." (doc. 85-1 at 24, Bass Aff.).  Inmate Chin stated he heard Quinn and Byrd coach Thompson (doc. 85-1 at 26–27, Chin Aff.).

whether or not both officers were at his cell, Thompson has never wavered in his allegation that Byrd coached him. Thompson's allegations in his original complaint and amended complaints, which he signed under penalty of perjury, as well as Thompson's own affidavits consistently state that Byrd coached him (doc. 1 at 10; doc. 21 at 11; doc. 64 at 10; doc. 85-1 at 30–31, Thompson Aff.). Inmate Jerome Lockhart also states he heard Byrd coach Thompson (doc. 85-1 at 23–24, Lockhart Aff.). Therefore, Thompson has shown a genuine issue of fact as to whether Byrd coached him to engage in disruptive behavior to make the unjustified use of force ordered by Warden Tifft appear justified.

Third, the parties dispute whether Thompson was creating a disturbance in the wing prior to approximately 7:25, when Byrd, Quinn, Lee, and Johnston entered the wing with the handheld video camera, and Defendant Byrd approached Thompson's cell. Defendants submitted affidavits stating Thompson was creating a disturbance at several times throughout the afternoon and early evening. Thompson denies this in his statement of material and genuine facts, which he submitted under penalty of perjury (doc. 85 at 3–13). The fixed-wing video does not include audio and thus does not resolve this factual dispute. Thompson has shown a genuine issue of fact as to whether he was creating a disturbance in the wing prior to the officers' entering the wing with the video camera.

Resolving these factual disputes in Thompson's favor, the evidence goes beyond a mere dispute over the reasonableness of Defendants's use of force, and would support a reliable inference of wantonness in their infliction of pain on Thompson. In other words, evidence that Defendant Tifft ordered the gratuitous use of force, and Defendants Quinn and Byrd carried out the order and coached Thompson to engage in disruptive behavior to make the use of force appear justified, supports a reliable inference that their use of force was gratuitous and excessive. Therefore, Thompson has produced sufficient evidence of an Eighth Amendment violation to withstand summary judgment. In light of this conclusion, Defendants' argument that they are entitled to qualified immunity, based solely on the ground that no Eighth Amendment violation occurred (*see* doc. 73 at 21–22), is unavailing. *See* <u>Skrtich</u>, 280 F.3d at 1301 (holding that "a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a

---

Trammel Allen stated, "Officer Quinn returned with Lt. Byrd and told Mr. Thompson . . . ." (doc. 85-1 at 21, Allen Aff.).

violation of the Constitution by the Supreme Court decisions in <u>Hudson</u> and <u>Whitley</u>." ). Therefore, Defendants' motion for summary judgment should be denied as to Thompson's Eighth Amendment claim.

     B.    <u>Punitive Damages Against Defendants in Their Individual Capacities</u>

     Thompson seeks punitive damages in the amount of $37,000.00 from each Defendant (doc. 64 at 15). The Prison Litigation Reform Act ("PLRA") provides, "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). "[T]he phrase 'Federal civil action' means all federal claims, including constitutional claims." <u>Napier v. Preslicka</u>, 314 F.3d 528, 532 (11th Cir. 2002). This action, brought by Thompson under 42 U.S.C. § 1983, is a "Federal civil action" under this definition. It is evident from the face of Thompson's pleadings that he was a prisoner at the time he filed this action, and that the harm complained of occurred while he was in custody. Thompson's punitive damages claims are based on the mental or emotional injury he suffered as a result of Defendants' use of excessive force, and/or the mental or emotional injury he suffered as a result of the fact of the alleged constitutional violation itself. The only alleged physical effect Thompson describes is a burning sensation on his body (doc. 73-2, Thompson Deposition 78:17–23, August 8, 2011). Thompson does not dispute he was permitted to shower for four (4) minutes and given clean boxer shorts after the application of chemical agent. He also does not dispute he voiced no complaints during his post-use-of-force medical examination. Thompson does not dispute he had no identifiable injuries that required medical treatment. He also does not dispute he was instructed to utilize sick call if any problems developed, but he did not do so. Thompson's allegations do not reasonably support an inference that he suffered more than de minimis physical injury. *See, e.g.*, <u>Magwood v. Tucker</u>, No. 3:12cv140/RV/CJK, 2012 WL 5944686, at *5 (N.D. Fla. Nov. 14, 2012) (unpublished) (prisoner failed to show more than a de minimis physical injury resulting from officer's use of chemical agent, where he alleged he suffered bloody nose and bloody phlegm, and therefore could not recover compensatory or punitive damages), *Report and Recommendation Adopted*, 2012 WL 5944657 (N.D. Fla. Nov. 28, 2012); <u>Robinson v. Tifft,</u> No. 3:11cv560/LAC/CJK, 2012 WL 2675467, at *2

(N.D. Fla. June 1, 2012) (unpublished) (prisoner failed to show more than a de minimis physical injury resulting from officer's use of chemical agent, for purposes of § 1997e(e), where he alleged he suffered "involuntary closing and burning sensation" in his eyes and was temporarily blinded), *Report and Recommendation Adopted*, 2012 WL 2675469 (N.D. Fla. July 6, 2012); Kornagay v. Burt, No. 3:09cv281/LAC/EMT, 2011 WL 839496, at *21–22 (N.D. Fla. Feb. 8, 2011) (unpublished) (prisoner failed to show more than a de minimis physical injury resulting from officer's use of chemical agent, for purposes of § 1997e(e), where he alleged he suffered burning lungs and skin, congested breathing, tearing eyes, nasal discharge, dizziness, the sensation of respiratory distress, choking, and burns to his scalp), *Report and Recommendation Adopted*, 2011 WL 855619 (N.D. Fla. Mar. 9, 2011); Jennings v. Mitchell, 93 F. App'x 723, 725 (6th Cir. 2004) (unpublished) (prisoner who suffered the discomfort of pepper spray had shown only de minimis injury, insufficient to satisfy § 1997e(e)); Palmer v. Walker, No. 2:09cv401, 2011 WL 836928, at *8 (M.D. Fla. Mar. 9, 2011) (unpublished) (prisoner who suffered slight burning and watering of eyes as the result of application of chemical agents failed to show more than a de minimis physical injury under § 1997e(e), and thus could not recover punitive damages). Therefore, Thompson's claim for punitive damages should be dismissed. *See* Harris v. Garner, 190 F.3d 1279, 1287–88 (11th Cir. 1999) ("Harris I"), *vacated in part and reinstated in part on reh'g*, 216 F.3d 970 (11th Cir. 2000) (en banc) ("Harris II") (affirming district court's dismissal, under 42 U.S.C. § 1997e(e), of prisoners' compensatory and punitive damages claims arising from prison officials' alleged unconstitutional conduct, where prisoners alleged no physical injury arising from that conduct); Al–Amin v. Smith, 637 F.3d 1192 (11th Cir. 2011) (holding that "the overall tenor of Harris and its progeny, when taken together, unmistakably supports" the conclusion that § 1997e(e) applies to constitutional claims and precludes the recovery of compensatory and punitive damages in the absence of the requisite physical injury). The only damages Thompson will be able to recover, if successful, are nominal damages.[9] He may also be entitled to the declaratory and injunctive relief he seeks.

---

[9] In his prayer for relief, Thompson requests "presumed damages" for his costs, punitive damages, attorney fees, declaratory and injunctive relief, and "any additional relief this court deems just, proper and equitable" (doc. 64 at 14–15). The court liberally construes his prayer for relief as including nominal damages.

C.      Official Capacity Claims for Damages

Although Thompson may proceed with his nominal damages claims against Defendants in their individual capacities, Thompson's official capacity claims for damages must be dismissed as barred by the Eleventh Amendment.  The Eleventh Amendment is an absolute bar to suits for monetary damages by an individual against a state or its agencies, or against officers or employees of the state or its agencies in their official capacities.  *See* Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989); Edelman v. Jordan, 415 U.S. 651, 662–63, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974).  Absent waiver or express congressional abrogation, neither of which is present in this case, the Eleventh Amendment prohibits a suit against a state in federal court.  *See* Kentucky v. Graham, 473 U.S. 159, 167 n.14, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985).  Florida has not waived its Eleventh Amendment immunity from suit in federal court.  *See* Fla. Stat. § 768.28(17).  Furthermore, Congress did not intend to abrogate a state's Eleventh Amendment immunity in § 1983 damage suits.  *See* Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation, 49 F.3d 1490 (11th Cir. 1995).  Florida has not waived its sovereign immunity or consented to be sued in damage suits brought pursuant to § 1983.  *See* Gamble v. Fla. Dep't of Health & Rehabilitative Servs., 779 F.2d 1509, 1513 (11th Cir. 1986).   Therefore, Thompson's official capacity claims for damages must be dismissed.

D.      State Law Claims

Thompson claims that Defendants violated several Florida criminal statutes, specifically, sections 837.02, 837.021, 037.05, 837.055, and 837.06 (doc. 64 at 11).  The law is well-settled that a private citizen "has no judicially cognizable interest" in the criminal investigation or prosecution of another.  Otero v. United States Attorney Gen., 832 F.2d 141 (11th Cir. 1987) (citing Linda R.S. v. Richard D., 410 U.S. 614, 619, 93 S. Ct. 1146, 35 L. Ed. 2d 536 (1973)); *see also* Cok v. Cosentino, 876 F.2d 1, 2 (1st Cir. 1989) (holding that a private citizen has no authority to initiate a criminal prosecution); Sattler v. Johnson, 857 F.2d 224, 226–27 (4th Cir.1988) (holding that a private citizen has no constitutional right to have other citizens, including state actors, criminally prosecuted); O'Berry v. State Attorneys Office, 214 F. App'x 654, 657 (11th Cir. July 23, 2007) (unpublished) (affirming district court's finding that a private citizen cannot force the United States

Attorney General to bring a criminal prosecution against another citizen). Therefore, Thompson is entitled to no relief on his claims that Defendants violated state criminal statutes.

V.   CONCLUSION

Viewing the evidence in the light most favorable to Thompson, the non-movant, genuine disputes of material fact exist which preclude summary judgment on his Eighth Amendment claim of excessive force by Defendants Byrd, Quinn, and Tifft. Therefore, Defendants are not entitled to summary judgment. However, Thompson's punitive damage claims against Defendants, as well as his claim for nominal damages against them in their official capacities, should be dismissed. Additionally, his state law claims should be dismissed.

Accordingly, it is respectfully **RECOMMENDED**:

1.   That Defendants' motion for summary judgment (doc. 73) be **GRANTED IN PART** to following extent:

a.   Plaintiff's claims against Defendants for punitive damages be **DISMISSED** pursuant to 42 U.S.C. § 1997e(e);

b.   Plaintiff's claim for nominal damages against Defendants in their official capacities be **DISMISSED**;

c.   Plaintiff's state law claims be **DISMISSED**.

2.   That Defendants' motion for summary judgment (doc. 73), be otherwise **DENIED** and Plaintiff's Eighth Amendment claim against Defendants be permitted to proceed.

At Pensacola, Florida, this 30th day of April 2013.

/s/ Elizabeth M. Timothy
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of objections shall be served upon the magistrate judge and all other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**